DANIEL C. ROBINSON, Inc. v.
UNITED STATES.
No. 46250.

United States Court of Claims.
Feb. 6, 1951.

Thomas F. Daly, New York City, Lord, Day & Lord and John W. Castles, all of New York City, on the brief, for plaintiff.

Kendall M. Barnes, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

John A. Wilson, New York City, Shearman & Sterling & Wright, New York City, and Boykin C. Wright and William F. Hamilton, New York City, on the brief, for Ford Motor Co.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

Plaintiff seeks compensation for the taking of the use of its two barges and for the taking of its interest, as bareboat charterer, in a tug. The barges were former lake-type steamers built during World War I; they were converted in 1928 into the nonself-propelling barges Lake Farge and Lake Frumet. They and the tug Humrick were owned by the Ford Motor Company. In January 1942 plaintiff took over operation of the three vessels under an oral time charter arrangement with Ford. On April 30, plaintiff became bareboat charterer of the tug for "about" one year at a charter rate of $200 per day; and on May 6 or 7 plaintiff bought the barges for $50,000 each.

At this time the three vessels were in Norfolk. From Norfolk the barges carried coal to Havana, went light to Santiago, and carried manganese to Mobile. While the equipment was in Mobile plaintiff was directed by the War Shipping Administration to send it to Havana to enter the sugar trade from Havana to Port Everglades, Florida.

The period between July 4 and July 29, 1942, was spent carrying coal from Mobile to Havana and awaiting Navy orders there. Delay while awaiting Navy orders was a common, if not usual, incident at the time. The submarine menace had required the imposition of controls of departures and routings and the convoying of all vessels,

including barges and tugs, using these waters.

Between July 30 and October 13, 1942, each barge made one trip from Havana to Port Everglades with sugar, one trip from Port Everglades to Havana with general cargo, and another trip carrying sugar from Havana to Port Everglades, where the requisitionings occurred. On September 25, 1942, the War Shipping Administration had wired plaintiff and the Ford Motor Company that it was requisitioning the "use and possession on bareboat charter basis" of the barges Lake Farge and Lake Frumet and the tug Humrick, effective on delivery of the vessels at Port Everglades. The Lake Frumet was delivered on September 30, 1942; the tug Humrick on October 9; and the Lake Farge on October 14.

The vessels were operated for the Government under a general agency agreement by Barge Carriers, Inc., a corporation headed by plaintiff's president. The barges were redelivered to plaintiff in 1944, the Lake Frumet on January 28 and the Lake Farge on February 2. The War Shipping Administration determined that fair and just compensation for the use of the barges was $60 per day per barge. On May 11, 1944, it tendered to plaintiff requisition charters, bareboat form, providing for payment of charter hire at this rate. Plaintiff rejected the tenders and, in accordance with the statute, was paid 75 percent of the amount offered. Plaintiff sues now "to recover such further sum as added to such 75 per centum * * * will be just compensation for the use of the property * * *." Section 902 of the Merchant Marine Act of 1936, 49 Stat. 1985, 2015, as amended by 53 Stat. 1254, 1255, 46 U. S.C.A. § 1242.

The plaintiff claims for the taking of its interest in the tug Humrick, as well as for the barges. The War Shipping Administration never acknowledged plaintiff's interest, if any, in the tug. Whether plaintiff had a compensable interest in the tug (which it had chartered from the Ford Motor Company) and, if so, whether its claim with respect to the tug was not

abandoned or otherwise lost are questions which we need not decide; for plaintiff has failed to prove that it was damaged by the requisition of the Humrick. Plaintiff has failed to prove that the value of the use of the tug was greater than the $200 per day which it was paying the Ford Motor Company for the use of the tug.

In our findings we have set out in detail the financial consequences to plaintiff of its operation of the barges from the time it bought them to the time they were requisitioned. The plain fact is that plaintiff was losing money. Its net loss during the period was $98.70 per barge per day. The losses were caused in large part, if not altogether, by delays incident to the submarine menace. There is no showing that plaintiff or anyone else anticipated such improvement in conditions as would make the value of the use of the barges more than $60 per day. The requisitionings occurred only after plaintiff's president had visited Washington early in September 1942 and appealed to the War Shipping Administration for relief from mounting financial losses. At that time he assented to a suggestion that the equipment be requisitioned. There is no evidence of the earnings or losses of other barges in the sugar trade, or in other trades, during 1942. If we limit our consideration to facts known at the time of the requisitionings, we should perforce have to conclude that plaintiff has failed to establish that the fair and reasonable value of the bareboat use of the barges was greater than $60 per day.

Plaintiff says that our consideration should not be so limited. It says that we should consider, as an element affecting the determination of just compensation, the earnings of the barges during the period of requisition. Plaintiff was permitted to place in the record, for consideration if found proper, evidence summarizing the voyage accountings of the barges submitted to the War Shipping Administration by its general agent during the period of requisition, together with adjustments tending to show the results of a private operation receiving the same revenues. Plain-

tiff says that in a taking of this sort, which finds no counterpart in voluntary exchanges, it is proper, in determining just compensation, to consider the profits arising during such period, and that the adjusted summary of voyage accountings offered by it reflects such profits. According to the adjusted summary, the net operating revenue throughout the entire period of requisition was $827 per day per barge.

■ Where the use of property is taken, the proper measure of compensation is the rental (or its equivalent, such as charter hire) that probably could have been obtained. Where the use of the property is taken for a limited, definite time, the usual rule requires the determination of the probable rental from facts which were known or could have been known at the time of the taking. Where the taking of the use is for an unlimited, indefinite time, as here, permitting the Government to hold the property on a day-to-day basis for any length of time it chooses, plaintiff maintains that the application of the rule limiting consideration to facts known at the time of the taking is unrealistic.

■ We agree. We think that where the use of property is requisitioned for an uncertain period, evidence as to profits made from it by the Government and profits made from similar property in private ownership and management should, under some circumstances, be admitted and considered, not as the measure of value, but as bearing on the value.[1] Certainly in some cases such evidence would tend to throw light on the value of the use during the period the barges were retained. We have therefore considered the evidence which was offered for the record, but excluded by the commissioner.

We find the proffered evidence unconvincing, because of the circumstances under which the purported earnings accrued.

The War Shipping Administration established rates for the transportation of sugar from Cuba to the United States in the spring of 1942. Up to that time sugar had been brought to the United States from Cuba in small, self-propelled cargo vessels. The rates established by the War Shipping Administration were computed to reimburse the operator of a self-propelled vessel of 3,500 to 5,000 dead-weight tons for all normal costs of operation and to allow a margin of profit. When the Cuban sugar rates were established, the War Shipping Administration had begun withdrawing the self-propelled vessels from the trade for use in other work, and was substituting barges towed by tugs to carry the Cuban sugar. By the end of September 1942, barge transportation of Cuban sugar was predominant over transportation by powered vessels.

The War Shipping Administration had control, under the Ship Warrants Act, 55 Stat. 591, of the trades to be entered by barges as well as powered vessels. Moreover, most of the barges in the Cuban sugar trade during the period of requisition in question were, like plaintiff's barges, operated for the account of defendant. The evidence is not specific, beyond a point. It does show that only one owner (a man named Atwater) engaged in the Cuban sugar trade during this period was operating for his own account, and that he had two, possibly four, barges out of a total of ten or more engaged in the trade.

The Atwater operation is the real basis of plaintiff's contention. The Atwater barges, not requisitioned, supposedly made substantial earnings in 1943 and 1944. Plaintiff believes that it might also have had a bonanza if its barges had not been requisitioned. Therefore, plaintiff contends, it should have some measure, say half, of what Atwater was able to earn. This is the foundation upon which plain-

---

1. This observation runs counter, to some extent, to the rule applied by this court in Johnson v. United States, 2 Ct.Cl. 391, cited with approval in Pope v. United States, 26 Ct.Cl. 11; Pasqueau v. United States, 26 Ct.Cl. 509; and Atwater v. United States, 106 Ct.Cl. 196. The rule of the Johnson case is not to be applied rigidly and under all circumstances, especially where, as here, the taking occurred during a period of financial reverses and the use of the property extended into a period when the causes of the financial reverses were no longer operative.

tiff's president testified that compensation at the rate of $400 per day per barge was requested, because it was "somewhat less than half of the daily earnings of the barges" during requisition.

The record does not tell us more about what Atwater earned or how much of it he was able to keep. It does not show what his operating costs were, nor whether his contracts were renegotiated. Atwater gambled. He did not ask for requisition, and his barges remained his own. Plaintiff believes his gamble paid off, and now plaintiff, who weakened under the strain and who asked for and secured relief by way of requisition, complains of what might have been.

The consideration of what might have been cuts both ways. The Government might well have readjusted the rates applicable to the Cuban sugar trade, to base them on transportation by barge instead of self-propelled vessels, if the majority of the barges in the trade had not been operated for its account or if there had been private operators other than Atwater in the trade. What appears to have been a highly favorable situation for Atwater may not have been especially favorable at all, if the facts were known. Under the circumstances we must continue to view the revenues accruing to a general agent of War Shipping Administration as moneys transferred by the Government from one pocket to another. We cannot say, on the evidence before us, that they represent the potential of earnings of a private barge operation.

■ After giving full consideration to the evidence excluded by the commissioner, and to all other evidence in the record, including the facts existing at the time of and just prior to the requisition and excluding the enhancement due to the causes necessitating the taking, we think the record fails to show that the value of the use of these barges was greater than the award of the War Shipping Administration. Plaintiff has failed to establish

that the fair and reasonable value of the bareboat use of the barges was greater than $60 per day per barge.[2]

The Government does not contend that plaintiff is not entitled to the balance of the administrative award, and we give judgment for that amount, less an offset for defendant's counterclaim.

■ Besides the balance of the administrative award, plaintiff is entitled to an additional sum as compensation for delay in payment. Compensation for the use of property is normally made periodically, for example, $60 per day payable monthly. The requisition charters tendered plaintiff provided that the charter rate of $60 per day should be payable on the first day of each calendar month for the preceding month. Plaintiff received no payment at all until September 23, 1944, when 75 percent of the administrative award was paid. It is therefore entitled to interest on the amount of each such monthly payment from the time such payment was due until September 23, 1944. The interest thus computed, at the rate of four percent per annum, amounts to $2,905.59. It is allowed, in accordance with our usual practice in such cases, not as interest but as compensation for delay in payment.

■■ On its counterclaim defendant is entitled to $5,170.19, which is the amount by which the fair value of the unbroached consumable stores, fuel, water, expendable equipment, and spare parts on the barges when they were redelivered to plaintiff exceeded the fair value of such stores, fuel, water, equipment, and parts on the barges when they were delivered under requisition. Defendant states in its brief that it is entitled to interest on this sum from February 2, 1944. Since at the time of payment of the 75 percent the defendant stood willing to pay the additional 25 percent for which judgment is here given, which additional amount is more than the total of the counterclaim, the defendant is not entitled to interest on its counterclaim beyond the date of payment of the 75 per-

2. The $60 per day per barge awarded by the War Shipping Administration would return plaintiff's entire investment in the barges in less than two and one half years.

cent. Interest on the amount of $5,170.19 at the rate of four percent per annum from February 2, 1944, to September 23, 1944, is $132.54.

Judgment will be entered for plaintiff for $14,417.50, the unpaid balance of the administrative award; plus interest in the amount of $2,905.59; less $5,170.19 plus interest in the amount of $132.54 (the amount, including interest, which defendant is entitled to recover on its counterclaim). Defendant's contingent claim against the Ford Motor Company will be dismissed. It is so ordered.

WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting in part).

I am unable to agree with that part of the Court's decision which finds that $60 per day was just compensation for the Government's use of the plaintiff's barges Lake Farge and Lake Frumet. The Court has, correctly I think, received evidence of the events which occurred after the requisition, because the taking was on a day-to-day basis for any length of time the Government chose to keep the barges. Having received the evidence, the Court concludes that it does not prove anything, and with that conclusion I disagree.

During the period following the requisition, while the Government held and used the barges, the submarine menace was largely overcome, and coastal shipping became an orderly and profitable business, whereas before it had been unmanageable and unprofitable, at almost any conceivable rate for carriage. The plaintiff proved, by sound accounting methods, that at the rates which the Government paid itself, and permitted at least one private carrier to charge for the same service, the plaintiff's barges earned some $800 per day during the period they were used by the Government. The Government says that this figure is unrealistic because the Government would surely, if more of the carriage had been done by private carriers, have reduced the rates. I think this is probable, and I would discount the plaintiff's figures considerably for that reason. But I would not cut them from $800 to $60. The Court's opinion suggests that perhaps the private carrier who received the same rates that the Government paid itself on account of the plaintiff's barges did not make much of a profit after all. I find it hard to think of a reason why he did not, when the plaintiff's figures are based upon proper methods of accounting. It is suggested that if the private carrier did make a considerable profit, it may have been taken away from him by renegotiation or by the excess profits tax. If it is proper for us in a just compensation case to discount, for example, an admitted market price, because if we awarded it it would result in a profit so large that it would call for renegotiation or be taxable as an excess profit, I think the Government should suggest a formula by which we could determine a proper discount.

The Court attaches importance to the fact that the plaintiff's operations were so unprofitable shortly before the requisition, that the plaintiff's president invited requisition, to avoid further losses. I think this means only that the market went up sharply, because of the change in the submarine situation. Undoubtedly the Government could, if it had been willing to commit itself, have made a favorable bargain with the plaintiff in its then discouraged state of mind. But it did not make such a bargain, and only took the barges from day to day. It thereby took its chances as to whether the market would go up or down.

The evidence shows that the $60 per day figure was based largely on the cost of the barges to the plaintiff, and on the assumption that a large part of what would otherwise have been the fair value of the use was enhancement due to the causes which necessitated the taking by the Government. It was wrong to attach so much importance to the plaintiff's costs. And I think there was very little in the value of the use which was properly deductible under Section 902 of the Merchant Marine Act, as interpreted by the decision in United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392.

I would award the plaintiff $150 per day for the use by the Government of each of the plaintiff's two barges.

Judge HOWELL agrees with this dissenting opinion.